[McDonald v. The State.]

# McDonald *v.* The State.

*Prosecution against Unlicensed Railroad Engineer.*

1. *Constitutionality of statute requiring examination and license of railroad engineers.*—The act approved February 28th, 1887, requiring railroad engineers to be examined and licensed by a board appointed by the Governor, and making it a misdemeanor, punishable by fine or hard labor for the county, one or both, for any engineer to operate an engine on any railroad without having been examined and duly licensed (Sess. Acts 1886-7, pp. 100-2), is a mere internal police regulation, and not an unauthorized interference with inter-state commerce, though incidentally affecting that commerce; nor is it objectionable on constitutional grounds, either as conferring judicial powers on the board of examiners, or as depriving the citizen of any natural right without due process of law.

APPEAL from the City Court of Montgomery.

Tried before the Hon. THOS. M. ARRINGTON.

The appellant, Lorenzo D. McDonald, was prosecuted for, and found guilty of, a violation of the act entitled "An act to require locomotive engineers in this State to be examined and licensed by a board to be appointed by the Governor for that purpose," approved Feb. 28, 1887.—Acts of 1886-7, p. 100. The first section of the act provides, "that it shall be unlawful for the engineer of any railroad train in this State to drive or operate or engineer any train of cars or engine upon the main line or road-bed of any railroad in this State which is used for the transportation of persons, passengers or freight, without first undergoing an examination and obtaining a license as hereinafter provided."

The subsequent sections of the act provide for the appointment by the Governor of five skilled mechanics as a board of examiners, to examine such engineers "in practical mechanics and concerning their knowledge of operating a locomotive and their competency as engineers," and if found competent, to license such engineers on payment of a fee of $5; and in addition to the examination, it is further made the duty of the board of examiners, "before issuing the license, to inquire into the character and habits of all engineers applying for license;" and to issue no license "if the applicant is found to be of reckless or intemperate habits." It is further provided, "that any engineer, who, after procuring a license as required in this act, shall at any time be guilty of any act of recklessness, carelessness or negligence,

[McDonald v. The State.]

while running an engine, by which any damage to persons or property is done; or who shall within six hours before, or during the time he is engaged in running an engine, be in a state of intoxication, shall forfeit his license, with all the rights and privileges acquired by it, indefinitely or for a stated period, as the board of examiners may determine after notifying such engineer to appear before the board and inquiring into his act or conduct;" and that "it shall be the duty of the board to determine whether the engineer is unfit or incompetent by reason of any act, or habit unknown at the time of his examination, or acquired or formed subsequent to it, and if it is made to appear that he is unfit or incompetent from any cause, the board shall revoke or cancel his license, and shall notify every railroad in this State of the action of the board." The penalty for a violation of the provisions of the act, is a fine of not less than fifty nor more than five hundred dollars, and the offender may, also, be sentenced to hard labor for the county for not more than six months.

It was proven that the appellant had never applied for or obtained a license as required by this act, and that he operated an engine and train, which was a through train, for the transportation of freight from Atlanta, Ga., to Montgomery, Ala., and for points beyond on the Western Railway of Alabama, a railroad in this State from West Point to Montgomery, and that this railroad was operated under one management with the Atlanta and West Point railroad in the State of Georgia, and these two roads formed a continuous line from Montgomery, Ala., to Atlanta, Ga., for the transportation of freight and passengers and the United States mail.

TROY, TOMPKINS & LONDON, and GEO. P. HARRISON, for appellant, contended that the act was unconstitutional, because, *first*, it was a regulation of interstate commerce; and, *second*, it conferred judicial power on the board appointed by the Governor and deprived the citizen of his liberty and property, without due process of law. The following authorities cited and discussed : *State Freight Tax*, 15 Wall. 232, 276, 279, 280 ; *Cooley v. Port Wardens*, 12 How. 299 ; *Welton v. Missouri*, 91 U. S. 282 ; *Robbins v. Shelby Taxing District*, 120 U. S. 493 ; *Wabash, &c. R'y Co. v. Illinois*, 118 U. S. 557 ; *Pickard v. Pullman, &c. Car Co.*, 117 U. S. 34 ; *R. R. Co. Husen*, 95 U. S. 465 ; *Fargo v. Stevens*, U. S. S. C., April 4, 1887 ; 1 Kent Com. 389, 391 ; 95 U. S. 485 ; 15 Wall. 557.

THOS. G. JONES, also of counsel for appellant, in addition to the above propositions, urged the following : " 1. The act makes an *unauthorized* delegation of legislative power. It does not prescribe any rule of conduct—does not define or determine, with any certainty, any qualification ; but leaves it in the arbitrary discretion of each examiner to erect his own standard of qualification, and then to judge of the fitness of applicants, according to the standard which the examiner and not the *law* prescribes. These qualifications may vary with each examiner ; and the statute furnishes no certain rule by which any tribunal on earth can determine whether an applicant is entitled to a license— even when the facts as to the extent of his knowledge are undisputed. The act, § 2, provides for examination by two or more members of the board, and then by proviso to § 6, that " any one of the said board may license ? &c. All that the act says about qualification, even by implication, is that the engineer " shall be examined " *in practical mechanics,* and concerning his *knowledge of operating a locomotive* engine, *and his competency as an engineer.*" What quantum of knowledge is requisite in " practical mechanics ? " The term takes in a very wide range in the domain of science. We suppose the term here used means " the practical application of the laws of matter and motion to the construction of machines—mechanical construction or labor." This is one of the definitions we find in the dictionary. Can an engineer, otherwise competent, be rejected because he was not competent to build an engine ? If he knows how to build one, but is not a practical " boiler maker," and therefore could not construct a " boiler," is he so deficient in " practical mechanics," as to be unfit to be entrusted with running the engine ? If he does not know what is the best iron to be used in boilers, or for flanges of the wheels, is he to be rejected ? How far is his knowledge of the best pattern of locomotive, to be potent in rejecting the applicant ? If the practical mechanic is unskilled in chemistry, and does not know with accuracy the chemical action of different waters on the boiler, is that to reject him ? If he is not skilled as to the best test for ascertaining the number of pounds of pressure that the engine will carry, will that reject him ? These questions might be multiplied all through the domain of " practical mechanics," and the only answer, under this law, would be lodged in the breast of the individual examiner. So again, concerning his " knowledge of operating a locomotive engine," and so again his competency as an engineer? What amount of visual power is required ? What age will disbar ? Must the applicant

[McDonald v. The State.]

have served as a fireman? What amount of general education is requisite? What physical powers must the engineer possess? If he has lost some of his fingers, will that disqualify him? Is a man with one good eye competent? Throughout all the numerous conditions or qualifications prescribed, the law lays down no rule. Every one may be determined by each examiner according to his own discretion. The law furnishes no rule to guide him. There may be as many different rules as there are examiners; and each examiner may change his rulings as often as he pleases; and each may differ from the other. There is no appeal to any tribunal; and no way to revise an erroneous judgment of the examiners."—*Yick Wo v. Hopkins*, 118 U. S. 356.

SOMERVILLE, J.—The act of 1886-87, pp. 100-102, requires locomotive engineers in this State to be licensed, after examination as to competency and fitness, by a board authorized to be appointed by the Governor for that purpose.—Acts, 1886-87, pp. 100-102. It is insisted that the act is unconstitutional for several reasons.

The first objection is, that it is a regulation of commerce between the States, and for this reason, violative of the clause of the United States constitution which vests in Congress the power to regulate such commerce.

In our opinion it is a mere internal police regulation, which was competent to be provided for by the State, as a proper mode of preserving the safety of the traveling public, and other persons, whose lives may well be imperilled by the negligence of ignorant and incompetent engineers. It incidentally affects interstate commerce, but does not amount to a regulation, any more than laws licensing, by State authority, pilots of vessels engaged in such commerce, which have always been held free from constitutional objection. The laws of the several States have undertaken not only to license pilots in such cases, but have gone so far as to regulate the whole subject of pilotage and pilots, fixing their qualifications, employment, and pay, including the tender of services, and, on refusal to employ, authorizing the recovery of half pay. These laws have been sustained, not on the ground that Congress had recognized them as valid, for it is clear that no such recognition could confer any constitutional power on the States which they did not already possess, but upon the ground that they were necessary police regulations, having in view the public safety, or if regulations of commerce in a certain sense, they were local regulations, of such a nature as to be permissible until Congress itself undertook to exercise the same power by

[McDonald v. The State.]

legislating on the subject.—*Cooley v. The Board of Wardens of Philadelphia*, 12 How. (U. S.) 143; *Ex parte Niel*, 13 Wall. 236.

There are many police regulations of this nature, incidentally affecting commerce, which have been sustained by the courts. It is well settled that the States may pass laws requiring railroads running from one State to another to fence their tracks, to ring a bell, or blow a whistle on approaching a crossing or highway, to erect gates or bridges, and keep flagmen at dangerous places on highways, to stop for reasonable times at certain stations, to fix and post printed time tables, rates of fare and freights, and other things of like character, having reasonably in view the prevention of fraud and extortion, or other injury, and the preservation of the safety of the public.—*Railroad Company v. Fuller*, 17 Wall. 560; *Mobile etc. R. R. Co. v. State*, 51 Miss. 137; *Com. v. Eastern R. R. Co.*, 103 Mass. 254; s. c., 4 Amer. Rep. 555; *People v. Boston & Alb. R. R. Co.*, 70 N. Y., 569; *Railroad Commissioners v. Portland etc. R. R. Co.*, 63 Me. 269; s. c., 18 Amer. Rep. 208; *Davidson v. State*, 4 Tex. Ct. App. 545; s. c., 50 Amer. Rep. 166; Tiedeman Lim. of Police Powers, § 194; Cooley's Const. Lim. (5th ed.), *579 *et seq.*

The exaction of a license in such a case does not impose a direct burden upon inter-State commerce, or interfere directly with its freedom. It only "acts indirectly upon the business through the local instruments to be employed, after coming within the State." It does not belong to that class of subjects which are national in their character and admit of but one system of regulation for the whole country, having in view the prevention of unjust discrimination and the preservation of the freedom of transit and transportation from one State to another.—*Wabash etc. Ry. Co. v. Illinois*, 118 U. S. 557, and cases there cited.

The case of *Robbins v. Shelby County Taxing District*, 120 U. S. 489, does not conflict with the foregoing views. The license there exacted of foreign drummers was held to be a tax on inter-state commerce. It was not a police regulation. Even in that case the stronger reasoning, in our judgment, is with the able opinion of Chief Justice Waite, concurred in by Justices Fields and Gray. In *Port of Mobile v. Leloup*, 76 Ala. 401, we sustained as constitutional an ordinance of the Port of Mobile imposing a license tax upon a telegraph company doing business in that city, between this and other States, which was inter-state commerce. In this we followed as authority the case of *Osborne v. Mobile*, 16 Wall. 497, in which the United States Supreme

Court sustained a similar license on an express company under like circumstances. The same question had been before decided in *Southern Express Company v. Mayor etc. Mobile*, 49 Ala. 404. In *City of New Orleans v. Eclipse Tow-Boat Co.*, 33 La. Ann. 647, s. c., 39 Amer. Rep. 279, in like manner, a city ordinance exacting a license fee from the owner of tow-boats, running on the Mississippi River to and from the Gulf of Mexico, was held not unconstitutional as a regulation of commerce, upon authority of the same decision. In *The Amer. Union Tel. Co. v. The Western Union Tel. Co.*, 67 Ala. 26, we held that the provisions of our constitution prohibiting foreign corporations from doing business in this State without having at least one known place of business and an authorized agent therein, "was a legitimate exercise of the police power, and was not a regulation of commerce, as applied to a telegraph company doing business between this and other States."

2. The other objections to the law, based on constitutional grounds, are, in our opinion, not maintainable. It does not confer judicial power on the board appointed by the Governor, nor does it deprive the citizen of his liberty or property without due process of law. The vesting, by legislative authority, of the power to license various occupations and professions, requiring skill in their exercise, or the observance of the law of hygiene, or the like, has never been construed to be obnoxious to these objections. It has been uniformly held that laws providing by accustomed modes for the licensing of physicians, lawyers, pilots, butchers, bakers, liquor dealers, and in fact all trades, professions and callings, interfere with no natural rights of the citizen secured by our constitution.—*Mayor etc. Mobile v. Yuille*, 3 Ala. 137; *Dorsey's Case*, 7 Port. 295; *Cooper v. Schultz*, 32 How. Prac. Rep. 107, and authorities cited; *Coe v. Schultz*, 47 Barb. (N. Y.) 64; *The Metropolitan Board of Health v. Heister*, 37 N. Y. 661; *Reynolds v. Schultz*, 34 How. Pr. Rep. 147; *People v. The Medical Society of New York*, 3 Wend. 426; *Metropolitan Board of Excise v. Barrie*, 34 N. Y. 627; *Barbier v. Connally*, 113 U. S. 27; *Soon Hing v. Crowley*, 113 U. S. 703; *Slaughter-House Cases*, 16 Wall. 36.

The case of *Yick Wo v. Hopkins*, 118 U. S. 356, does not, in our opinion, lend any favor to the contention of appellant. The municipal ordinance, there pronounced invalid, vested in the board of supervisors the arbitrary power to license public laundries at their own mere will and pleasure, without regard to discretion in the legal sense of the term, and without regard to the *fitness* or *competency* of the persons licensed, or the propriety of the locality selected for carry-

ing on such business.   Properly construed this case favors
the views above expressed by us.

The rulings of the court accord with these views, and the
judgment is affirmed.